UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PAUL PERSON,                              :

                          Petitioner,          :

    -against-                             :

ROBERT ERCOLE, Superintendent,            :
Green Haven Correctional Facility,

                                :

                    Respondent.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/23/13

08 Civ. 7532 (LAP) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE LORETTA A. PRESKA, U.S.D.J:**

    *Pro se* Petitioner Paul Person ("Petitioner") seeks a writ of habeas corpus under

28 U.S.C. § 2254, challenging the April 9, 2003 judgment convicting him, after a jury trial, of

three counts of Robbery in the First Degree, in violation of N.Y. Penal Law § 160.15, and two

counts of Robbery in the Second Degree, in violation of N.Y. Penal Law § 160.10.  Petitioner is

currently serving concurrent terms of 25 years imprisonment for each of the three counts of First

Degree Robbery, and 15 years for each of the two counts of Second Degree Robbery.  Petitioner

challenges his conviction on the grounds that (1) he was allegedly denied his due process right to

a fair trial when the trial court allowed the prosecution to introduce evidence of seven prior

uncharged crimes at trial; (2) he was allegedly denied his Sixth Amendment rights to

confrontation and to present a case in his defense when the trial court excluded evidence, in the

form of videotapes, of inconsistent statements by witnesses who testified against him; and (3) he

was allegedly denied effective assistance of appellate counsel when counsel failed to argue on

appeal that Petitioner had received ineffective assistance of trial counsel.  Respondent

Superintendent R. Ercole, Superintendent of Green Haven Correctional Facility[1] ("Respondent"), argues that Petitioner's claims should be dismissed as procedurally barred, non-cognizable, and/or without merit. For the reasons stated below, I respectfully recommend that the Petition be dismissed.

## BACKGROUND

### A.   Factual Background[2]

On December 18, 1999, in mid-town Manhattan, Oliver Johnson ("Johnson"[3]) and Nakia Shannon ("Shannon") robbed and murdered Thierry Matheron ("Matheron"), a French national who was an executive at a large accounting firm. (*See* Trial Tr. 73:25-74:20.[4]) As further set out below, Petitioner was incarcerated at the time of this crime, but he was prosecuted for his role in orchestrating the robbery and murder from prison.

---

[1] Petitioner was initially incarcerated at the Green Haven Correctional Facility, although he is currently incarcerated at the Sing Sing Correctional Facility, in Ossining, New York.

[2] The facts summarized herein are primarily taken from the testimony of the prosecution's witnesses at trial. To the extent relevant to the Petition, the Court will also note testimony that was disputed or contradicted.

[3] In some portions of the transcript, Johnson is referred to as "Al" because of his nickname, "Al Monday." (*See* Trial Tr. 94:16-95:11.)

[4] The state-court transcript that was provided to this Court is numbered in five segments. The first segment, with pages numbered 1 through 147, is a transcript of pretrial proceedings apparently held on June 20, 2001 ("June Pretrial Tr."), although the date is somewhat obscured on the copy of the transcript provided to the Court. The second segment, with pages numbered 1 through 44, is a transcript of pretrial proceedings held on October 30, 2001. The third segment, with pages numbered 1 through 385, is a transcript of proceedings held on February 13, 18, and 19, 2003, immediately preceding trial, including a *Molineux* hearing and jury selection ("Pretrial Tr."). The fourth segment, with pages numbered 1 through 1003, is the transcript of the trial itself, which began on February 20, 2003 ("Trial Tr."). The final segment, with pages numbered 1 through 14, is the transcript of Petitioner's sentencing held on April 9, 2003 ("Sentencing Tr.").

2

### 1.   Petitioner's December, 1999 Arrest

On December 7, 1999, 11 days before the murder, Petitioner was driving with Johnson in upper Manhattan, when their car was pulled over by police. (Trial Tr. 119:7-15.)  Both men were arrested, with Petitioner apprehended after attempting to flee the scene and allegedly discarding a gun along the way.  (*Id.* 119:18-120:7; 317:8-12.)  Johnson was released the next day (*id.* 120:13-15), but Petitioner was charged with gun offenses and held on $8,000 bail[5] (*id.* 316:11-14; 480:4-9).

At the time of the December 7 incident, Johnson and Petitioner had known each other for many years, as Johnson had been a close friend of Petitioner's older brother.  (*Id.* 97:12-98:4.) Johnson had a lengthy criminal history, and had been released from prison on parole in June, 1999.  (*See id.* 89:6- 93:13 (reviewing Johnson's history of arrests and imprisonment for burglary, larceny, and drug crimes); *see also id.* 95:5-97:11 (reviewing history of burglaries, prostitution, and drug use, for which Johnson was never charged).)

At Petitioner's trial, Johnson testified that, on the day of their arrests, he and Petitioner had been on their way to commit a robbery on 92nd Street in Manhattan.[6]  (*See id.* 117:1-3.)

_____

[5] Although Petitioner would not have needed to raise the full $8000 to post bail through the services of a bail bondsman, he would have needed to pay the bail bondsman at least some lesser sum, which he apparently did not have.  (*See* Trial Tr. 316:15-19 (Shannon testifying that Petitioner needed $3,400 to contract with bail bondsman); 483:3-14 (inmate witness Karl Ligon testifying that Petitioner's bail was "I think about five to seven thousand dollars" and that Petitioner needed to post "about twenty-five hundred"); 666:4-7 (Detective Delgrosso testifying that Petitioner needed $800 to post bail).)

[6] Johnson also testified that he had, falsely, told the district attorney that he and Petitioner had been on their way to rob Matheron, the victim of the robbery/murder for which Petitioner was on trial, "because [Johnson] thought that was what [the district attorney] wanted to hear." (Trial Tr. 83:3-12.)

Specifically, Johnson testified about a plan whereby he would visit his boss from a past job (an individual not named in the record), with whom Johnson had also sometimes had sex for money, and Petitioner would then approach both men with a gun and rob them (or "fake a robbery," with respect to Johnson). (*Id.* 117:1-20.)

After Petitioner's arrest, Petitioner, Johnson, and Shannon (Petitioner's then-girlfriend), had a series of phone calls coordinating the retrieval of Petitioner's car, which had been impounded at the time of his arrest. (*Id.* 123:22-126:5; 317:18-24; 319:8-14.) Johnson testified at trial that Petitioner, apparently taking the position that it was Johnson's "fault he got arrested so it's like [Johnson's] responsibility to get him out" (*id.* 130:13-19), also urged Johnson to collect money for Petitioner's bail, first by borrowing money and then by "do[ing] a robbery or something to get him out" (*id.* 129:3-130:7).

### 2.   The Robbery and Murder of Matheron

While Petitioner was in prison, unable to make bail, Johnson and Shannon robbed and murdered Matheron. Johnson had met Matheron through Steven Lee ("Lee"), Matheron's boyfriend, with whom Johnson had developed a friendship while the two were incarcerated together. (*Id.* 98:24-99:24.) Matheron and Johnson had met in person a few times, and Matheron had expressed interest in becoming sexually involved with Johnson for money.[7] (*Id.* 101:12-102:9.) The motive for the robbery was to get money for Petitioner's bail. (*Id.* 385:24-386:17.)

---

[7] Johnson testified that he refused Matheron's propositions. (Trial Tr. 102:5-9.) In pretrial proceedings, though, a detective testified that he had been told by Johnson that Johnson and Matheron had had a sexual relationship. (June Pretrial Tr. 79:1-6.) At trial, Johnson at first conceded that he had said this to the detective (although he testified that it had been a lie) (Trial Tr. 191:9-15), but, later, Johnson denied having even made the report to the detective (*id.* 223:7-12; 229:9-19).

In the lead-up to the robbery, Shannon procured a gun from her brother-in-law and brought it to Johnson. (*Id.* 326:5-13.) Johnson and Shannon traveled[8] to Matheron's high-rise apartment building on December 18, 1999 (*id.* 157:24), and were admitted by the doorman, with Matheron's approval (*id.* 149:4-9). When Johnson and Shannon arrived at the apartment, Matheron was on the phone with Lee and gave the phone to Johnson. (*Id.* 149:19-150:7.) According to Johnson, Lee expressed anger that Johnson was there with Matheron, and, after an "argument," Johnson hung up the phone. (*Id.* 150:8-19.) Johnson then took a gun out of a duffle bag and told Matheron to lie on the floor. (*Id.* 150:22-151:1.) While Shannon held the gun, which was apparently unloaded (*id.* 138:9-139:22), Johnson bound Matheron with duct tape (*id.* 151:4-24; 344:24-345:8). Johnson took Matheron's wallet; either Johnson or Shannon asked Matheron for his PIN; and Shannon wrote down the numbers Matheron gave. (*Id.* 151:22-152:15; 345:12-346:10.) Johnson then duct-taped Matheron's face and stabbed the back of Matheron's neck with a kitchen knife. (*Id.* 152:23-153:18; 348:1-3.) Johnson and Shannon covered Matheron with blankets, tilted the couch over him, and left. (*Id.* 153:19-25.)

Johnson and Shannon went to two nearby ATMs, but were unable to withdraw money with the PINs Shannon had written down. (*Id.* 155:2-19; 349:12-22.) Eventually, Shannon gave the cards, together with Matheron's photo identification, to Petitioner's uncle, who, with the help of a female acquaintance named "Mary" (*id.* 353:1-354:22), was able to use the documents to purchase various items, which the uncle then sold to a fence (*id.* 161:6-163:9). Petitioner's uncle gave Johnson "maybe seven hundred" dollars of the total proceeds, of which Johnson gave

---

[8] Although the pair took the subway to Manhattan, they traveled in Petitioner's car for preliminary trips earlier that day to drop off Shannon's children and retrieve the gun. (Trial Tr. 145:23-146:19.)

Shannon $500.[9] (*Id.* 163:10-164:18.) In the pre-dawn hours of the next day, Johnson got "intoxicated" and "drugged up" before returning to Matheron's building, where, upon showing Matheron's keys, he was admitted by a different doorman. (*Id.* 165:20-168:16.) Johnson returned to Matheron's apartment, went onto the terrace, and then ransacked the apartment, collecting items that he or Shannon might have touched, such as the phone receiver and notepad, and stealing checks and additional credit cards (most of which turned out to be expired). (*Id.* 168:24-170:9.) Johnson provided the checks to Petitioner's uncle, who used them to make additional purchases, some of which were again sold to a fence and some of which were given to Johnson as gifts for his family. (*Id.* 172:1-173:24.) Johnson testified that he was ultimately given half of the "maybe $1700" in proceeds, of which he kept about $250 and delivered the remainder to Petitioner's mother. (*Id.* 172:25-173:8.)

As discussed in greater detail below, both Johnson and Shannon later claimed – and testified at trial – that Petitioner had, in fact, directed the robbery and murder from prison and orchestrated or ordered specific actions.

### 3.   Investigation of the Matheron Murder

Petitioner's telephone calls in prison were overheard by inmate Karl Ligon ("Ligon"), who, informally, "ran the phones" in the prison housing unit where he and Petitioner were being held. (*Id.* 476:25-478:13.) Essentially, Ligon would "let" other inmates use the phones at his discretion, and he remained close to the phones while they were in use. (*Id.*; *see also id.* 486:4-12; 477:12-25 (Ligon testifying that he was "close-up on [prisoners] at all times" during their phone calls because he would buy and sell "minutes" and would therefore have to enter the

---

[9] Shannon testified that she later used that money to pay a lawyer because there was not enough for Petitioner's bail. (Trial Tr. 359:19-361:13.)

PIN that would enable a prisoner to use the phone).) Ligon had also become Petitioner's confidant, and Petitioner discussed the Matheron robbery and murder directly with him. (*Id.* 495:15-24.) Ligon, himself, was a career criminal (*see id.* 443:11-465:13 (reviewing Ligon's history of drug crimes, shootings, burglarizing drug dealers, robbing "[o]ver about a hundred" people at gun point, robbing various businesses, assaulting a prison officer, selling guns, and extortion)), who also had experience as a paid informant for the Bureau of Alcohol, Tobacco, and Firearms (the "ATF") (*id.* 442:13-443:10).

On December 20, 1999, Ligon called the police and informed the detective with whom he spoke that he had information about the murder of a white man by associates of an inmate at Riker's Island. (*Id.* 503:14-506:4.) Ligon gave the police details of the crime, such as that the victim had been duct-taped at the arms, legs and face, and stabbed in the neck, and that a couch had been turned over on top of him. (*Id.* 505:7-13.) Ligon initially declined to identify the source of his information, beyond stating that it was a fellow inmate, because he "felt if [he] gave them the name they wouldn't need [him]," and he "wanted consideration for [his] situation." (*Id.* 506:19-23.) In an interview with detectives on December 21, 1999, Ligon let Petitioner's name slip accidentally.[10] (*Id.* 609:9-610:5.) Although Ligon initially gave police a mistaken address for the location of the body, he eventually "somehow . . . got [Petitioner] to ask what train did they take" and then "put . . . together" enough information about the location to enable the police to find Matheron's body. (*Id.* 511:7-512:14.) Police found Matheron's body as Ligon had described it – on the 42nd floor of a doorman building near 48th Street and

---

[10] Although the police detective testified that Ligon had accidentally divulged Petitioner's name, Ligon testified that, without giving Petitioner's name, Ligon let enough details slip that the police were able to identify Petitioner as the inmate involved. (Trial Tr. 508:23-509:15.)

Eighth Avenue in Manhattan, duct-taped and stabbed, with blankets and a couch over it. (*See id.*, 613:14-615:9; 616:21-617:1; 643:6-15.)

Based on Ligon's information, police were able to identify Johnson and Shannon. (*Id.* 612:3-24; 652:4-5.) Police arrested Shannon on December 23, 1999 (*id.* 652:6-10), and she helped police locate Johnson (*id.* 366:7-23; 384:14-385:5; 653:18-655:5). Shannon gave verbal and written statements and then a videotaped interview with the District Attorney. (*Id.* 299:11-20.) In her videotaped statement, Shannon initially omitted her role in procuring or holding the gun. (*Id.* 299:23-24; 302:19-303:1.) Shannon, who was at the time pregnant with Petitioner's child, also denied that Petitioner had any role in the robbery and murder and said that Petitioner "didn't know about" the plan to rob Matheron. (*Id.* 299:23-300:25; 398:6-399:6.) Shannon also stated that, as she and Johnson were leaving the crime scene, Johnson told her that he had to go back because he had "left [his] fingerprints in there." (*Id.* 394:15-395:19.) After being confronted with statements from Johnson and his then-girlfriend (later wife) Elizabeth Hayes, Shannon finally admitted that she had procured the gun and pointed it at Matheron, but still denied that Petitioner was involved, claiming instead that the plot was Johnson's idea. (*Id.* 301:11-303:11; 401:9-402:12; 413:11-414:1.) During two subsequent meetings with the District Attorney, Shannon did not mention that Petitioner was involved in the robbery. (*Id.* 303:12-304:7; 305:6-23; *see also* 410:17-411:2.)

Johnson was arrested on December 23, 1999, and shown various incriminating evidence linking him to the crime. (*Id.* 175:1- 178:3.) Johnson initially told police that he had "fooled around" with Matheron on the day of the murder and that Matheron had given Johnson his credit cards as payment. (*Id.* 668:7-669:3; 670:5-13.) After being confronted with statements by Shannon and Hayes (*id.* 669:4-20), Johnson told police that he had put a "small piece of duc[t]-

8

tape over [Matheron's] mouth," but he denied duct-taping Matheron's entire head and said that

Shannon had been the one to pull the gun and to stab Matheron. (*Id.* 178:21-180:5.) Johnson

also gave a videotaped statement in which he stated that Shannon brought him the gun and duct

tape. (*Id.* 238:18-239:24.) Johnson asserted, on the tape, that Petitioner "didn't seem really the

threatening one about" getting Petitioner's bail money; rather "Nakia [Shannon] seem[ed] to be

the threatening one, like, 'You ought to get him out; you was with him.'" (*Id.* 235:21-25;

264:6-18.) Johnson denied any plan to murder Matheron, claiming "'it wasn't suppose[d] to be

going like that.'" (*Id.* 240:19-241:13; *see also id.* 242:7-17.) Johnson also said nothing on the

tape about Petitioner's having directed him to murder Matheron. (*Id.* 262:6-24; 270:5-16.)

The police expected that Petitioner would remain in prison on his pending gun charges,

but, in January 2000, detectives learned from Ligon, who had himself been released, that

Petitioner had been "released from jail unexpectedly." (*Id.* 655:25-656:10.) With Ligon's help,

the police eventually located and arrested Petitioner. (*Id.* 656:14-658:2.)

### B.   **Procedural History**

#### 1.   *Molineux* **Ruling**

In February 2003, just before Petitioner's trial began, the trial court heard an application

from the prosecution, under *People v. Molineux*, 168 N.Y. 264 (1901),[11] to admit evidence that

Petitioner had been involved in a series of prior crimes, including gunpoint robberies committed

---

[11] A *Molineux* hearing is a pretrial hearing to determine whether the prosecution may use uncharged crimes or other bad acts to establish a defendant's motive, intent, absence of mistake or accident, a "common scheme or plan," or identity. *See Molineux*, 168 N.Y. 264. This list of permissible reasons for the admission of evidence of uncharged crimes, as set forth in *Molineux*, has been held to be "illustrative and not exhaustive, . . . and evidence of uncharged crimes that is necessary to provide background material or to complete the narrative of the episode may also be admissible." *Bessaha v. Rock*, No. 09 Civ. 3581 (JFB) , 2012 WL 1458195, at *13 (E.D.N.Y. Apr. 27, 2012) (internal quotation marks and citations omitted).

with Johnson and Ligon, drug deals, murder, and two conspiracies to commit murder. (*See* Pretrial Tr. 31:1-35:1.[12]) The prosecutor argued that the facts were "such a web" that evidence of the prior bad acts was necessary to make sense of the prosecution's case. (*Id.* 33:5-9.)

Over Petitioner's objections (*see id.* 35:2-43:17), the trial court ruled that, at trial, the prosecution would be permitted to present evidence that Petitioner and Johnson were on their way to commit a robbery at the time when Petitioner was arrested on December 7, 1999, and charged with a weapons violation (*id.* 55:4-9); that Petitioner instructed Johnson to return to Matheron's apartment, kill the doorman, and remove evidence (*id.* 55:10-13); that, in 1989, Johnson had seen Petitioner shoot someone in the Bronx (*id.* 55:22-24); and that Petitioner and Johnson had committed three gunpoint robberies together (Trial Tr. 2:9-12).[13]  The court ruled, however, that certain other evidence would be excluded, including evidence of an alleged robbery committed by Petitioner and Ligon; evidence of crimes that Petitioner had allegedly committed with an associate of his named Barbara Nowlin and of an eventual alleged conspiracy by Petitioner to murder Nowlin; and evidence of a murder allegedly committed by Petitioner in North Carolina.  (Pretrial Tr. 55:14-56:1.)

---

[12] The trial court had previously held hearings on motions to suppress not relevant to the instant Petition.

[13] At the time of trial, Petitioner had not been convicted of any of the prior crimes, although he was facing pending charges for conspiracy to murder the doorman. (*See* Pretrial Tr. 58:23-59:2; Sentencing Tr. 7:12-20).  The weapons charges relating to the December 7, 1999 arrest were dropped for failure to prosecute (Pretrial Tr. 59:19-60:16), and Petitioner was never charged with the robberies or the 1989 murder (*See id.* 53:8-54:7; Sentencing Tr. 4:23-5:22). The Court, following Petitioner's usage, will refer to all of the crimes, collectively, as "uncharged crimes."

Before opening statements at trial, the court agreed to instruct the jury that any evidence of uncharged crimes could be considered only for specific purposes. (Trial Tr. 4:11-6:15.)

### 2.     Petitioner's Trial

#### a.     Testimony Regarding the Matheron Robbery and Murder

At Petitioner's trial, Shannon, Johnson, and Ligon all testified that Petitioner had orchestrated the robbery and murder of Matheron.

Johnson testified that Petitioner had originated the idea of robbing and killing Matheron as a way to secure money for Petitioner's bail, that Petitioner had arranged for Shannon to provide Johnson with a gun to commit the crimes, and that Petitioner had been the one who directed Johnson to return to the apartment. (*Id.* 130:20-132:7; 137:1-138:12; 140:17-141:23; 159:24-161:5.) Johnson also testified that Petitioner had threatened to "send somebody to do something" to Johnson's family, if Johnson did not get money from Matheron. (*Id.* 133:14-20.)

Shannon testified that she got the gun from her brother-in-law because Petitioner told her that Johnson "'kn[e]w somebody that he's going to rob and [Petitioner] want[ed] [Shannon] to get the gun.'" (*Id.* 323:8-324:17.) Shannon also testified that, when she told Petitioner what had happened, he told her to tell Johnson to return to the apartment, burn it to destroy fingerprints, and "get rid of the doorman." (*Id.* 358:9-24.) Shannon also testified that she had had "physical" fights with Petitioner and that she was "afraid of him because of those fights." (*Id.* 405:8-24.)

Johnson and Shannon also both testified that it was Petitioner who directed that Shannon accompany Johnson on the day of the original robbery (*id.* 148:19-149:3; 331:25-333:7; 335:24-336:4); that Petitioner had asked them repeatedly when they were going to commit the robbery (*id.* 336:5-12; *see also id.* 141:13-20); and that Shannon had called Johnson with the same question several times (*id.* 142:4-14; 337:1-8).

11

Ligon testified that he had become Petitioner's confidant and that the two had discussed the planned murder every day. (*Id.* 495:15-24.) Ligon testified that Petitioner told him that Petitioner would have to "use [Johnson] for this job" of robbing Matheron, but that Petitioner "got to guide him through it" because Johnson was "stupid." (*Id.* 487:7-12.) Petitioner also told Ligon that Petitioner was intimidating Johnson, in order to encourage Johnson to commit the robbery. (*Id.* 488:6-11.) Ligon testified that he heard Petitioner on the phone with Johnson and Shannon on multiple occasions and that Petitioner's tone during those conversations was "[v]ery aggressive." (*Id.* 488:12-489:17.) Ligon further testified that, using code language, Petitioner had encouraged Shannon to commit the murder and to get the weapon for Johnson. (*Id.* 491:4-492:1.)

Although Ligon testified to his extensive criminal history, he initially denied having "tied people up" (*id.* 537:2-6), but then admitted that he "just lied to this jury" when confronted with his own testimony in another trial admitting to tying up and robbing people "[o]n one occasion" (*id.* 537:7-23). At one point during Ligon's testimony, the trial court excluded a member of the audience for making "threatening" remarks, and Ligon stated on the record that he thought his "life is in danger right now." (*Id.* 471:17-472:17.)

The defense called no witnesses.

### b.    Johnson and Shannon's Prior, Videotaped Statements

During his cross-examination of Johnson, defense counsel read from the transcript of Johnson's statement to the police in December 1999, which gave a very different account of the robbery and murder and denied Petitioner's involvement. (*See e.g.* 234:3-243:8.) Similarly, defendant counsel cross-examined Shannon extensively based on the transcript of her prior statements, which were likewise inconsistent with her trial testimony. (*See, e.g., id.*, at 386:18-

12

402:19.)  On redirect, both Johnson and Shannon generally admitted to making the earlier

statements, but insisted that they were lying then and telling the truth at trial. (*See, e.g. id.*,

242:2-243:8; 402:11-19; 413:14-414:1.)

During Johnson's testimony, defense counsel mentioned that he would seek to play the

entire videotape of the witness's prior statement for the jury. (*Id.* 266:18-25.)  When, however,

defense counsel moved to admit the videotape into evidence at the end of Johnson's testimony,

the court summarily denied the motion. (*Id.* 274:21-275:3.)  Defense counsel renewed the

motion after the jury was excused for the day (*see id.* 276:12-23), at which point the prosecutor

argued that separate evidence of a prior inconsistent statement, such as a videotape, was

inadmissible once the witness admitted that he had, in fact, made the prior inconsistent statement

(*id.* 277:1-6).  Defense counsel countered that the video evidence was necessary because the

witness continued to deny having made some of his prior inconsistent statements. (*See id.*

277:14-21.)[14]  In response to that argument, the court ruled that "only the parts which are

inconsistent with [the witness's] testimony on the stand would be in any way admissible" (*id.*

277:22-24), and expressed a desire for the two sides to confer on which, if any, sections of the

tape met this criteria and would thus be admissible (*id.* 278:16-22).  Subsequently, after

Shannon's testimony, defense counsel again sought leave to introduce videotape evidence of the

witness's prior statements, but the court adhered to its prior determination that what portions of

such video, if any, would be shown to the jury would be "hashed out" after the defense and

---

[14] In reality, the only notable prior statement that Johnson denied having made to the police was his purported statement to detectives that he had had a sexual relationship with Matheron.  (*See supra* at n.7.)

13

prosecution conferred, and the court again stated that only the "prior inconsistent statement[s] would come in." (*See id.* 576:5-12; 588:14-589:16.)

After the prosecution rested, the defense sought to admit video excerpts on its direct case. (*Id.* 675:17-20.) The court once again heard argument from both sides on the admissibility of evidence of prior inconsistent statements that witnesses did not deny making, and the court clarified that its initial ruling had been intended to allow the introduction only of video evidence of "those statements which [the witnesses] denied [having made] when confronted with them at trial." (*Id.* 699:1-707:25; *see also* 708:1-712:10.) At that point, the parties agreed there were no such statements (at least none that defense counsel deemed sufficiently significant to present), and, thus, under the court's ruling, as clarified, the defense was not permitted to introduce any video. (*See* 707:17-25.) Defense counsel then moved for a mistrial on the ground that he had formulated his cross-examination strategy based on an incorrect understanding of the court's prior ruling – *i.e.*, he had understood that the court would allow the defense to introduce videotaped evidence of any prior statements made by the witnesses that were inconsistent with their trial testimony, even if the witnesses admitted having made those inconsistent statements – but the court denied that motion. (*See id.* 711:18-712:10.) The next day, the defense moved to admit the videotape evidence not for impeachment, but rather as admissions against interest; the Court denied that motion, as well. (*Id.* 714:5-717:15.)

### c.   **Evidence of Uncharged Crimes**

Over defense counsel's objections, but in keeping with the trial court's *Molineux* ruling, Johnson testified to certain of Petitioner's alleged prior bad acts, including his alleged shooting of an individual in 1989 (*id.* 111:1-112:4); his alleged commission of several armed robberies with Johnson before their December 7, 1999 arrest (106:17-110:25); and his alleged ordering of

14

Johnson to kill the doorman who had witnessed Johnson and Shannon being present at Matheron's building on the day of the Matheron murder (*id.* 160:21-25). Shannon corroborated Johnson's account of one purported robbery by testifying that, at some point in 1999, Petitioner had returned home with a large amount of jewelry, which he told Shannon he had procured by committing a robbery with Johnson. (*Id.* 376:7-377:5.) Ligon corroborated Johnson's and Shannon's testimony regarding the conspiracy to kill the doorman, with testimony that Ligon had heard Petitioner tell Shannon on the phone to tell Johnson to kill the doorman (*id.* 499:10-500:1), and had then heard Petitioner tell this to Johnson directly (*id.* 501:9-16).

The court instructed the jury that the introduced evidence of Petitioner's uncharged crimes was being admitted to show "intent and motive," as "background" to explain Petitioner's relationship to witnesses, and "because this testimony was inextricably interwoven" with the facts of the case. (*Id.* 896:5-11.) The court gave the jury a limiting instruction, informing the jury that it could not use the evidence of uncharged crimes as evidence of any propensity by Petitioner to commit crimes or as evidence of bad character. (*Id.* 896:11-17.)

### 3.   <u>Verdict and Sentencing</u>

The jury found Petitioner guilty on the robbery charges, but not guilty of felony murder. (*Id.* 998:14-999:13).[15] As noted above, the court sentenced Petitioner to 25-year terms of imprisonment on each of the three counts of robbery in the first degree and 15-year terms of

---

[15] In light of the conviction for robbery, and the death of the victim during the course of that robbery, a verdict of "not guilty" on the murder charges required the jury to have accepted Petitioner's affirmative defense that he did not have reason to believe that the other participants in the robbery would be armed with a deadly weapon or commit murder. (*See id.* 903:25-904:25; Sentencing Tr. 9:3-12.)

imprisonment on each of the two counts of robbery in the second degree, with all sentences to run concurrently, for a total of 25 years. (*See* Sentencing Tr. 12:24-13:4.)

### 4. Direct Appeal

### a. Appeal to the Appellate Division

Petitioner appealed his conviction to the Appellate Division on three grounds. (*See generally* Declaration of Leilani Rodriguez, Esq., in Opposition to Petition for a Writ of Habeas Corpus, dated Jan. 29, 2009 ("Rodriguez Decl."), Ex. A (Petitioner's brief to the Appellate Division).) First, Petitioner argued that the trial court's *Molineux* ruling and subsequent admission of evidence of "seven highly prejudicial uncharged crimes" violated Petitioner's constitutional rights to a fair trial and due process.[16] (*See id.*, at 50-64.) Second, Petitioner argued that the trial court's exclusion of the videotapes of Johnson's and Shannon's prior statements was reversible error and denied Petitioner his Sixth Amendment right to confront the witnesses against him. (*See id.*, at 65-74.) Third, Petitioner argued that his conviction was against the weight of the evidence. (*See id.*, 75-84.) Petitioner also argued for a reduction in his sentence based on various mitigating factors. (*See id.*, 85-93.)

The Appellate Division unanimously affirmed Petitioner's conviction and sentence. *People v. Person*, 810 N.Y.S.2d 68, 69 (1st Dep't 2006). Regarding Petitioner's various arguments, the Appellate Division held that (1) the trial court "properly exercised its discretion in receiving evidence of a series of uncharged crimes," *id.*, at 293, and that Petitioner's federal

---

[16] As enumerated in Petitioner's appellate brief, the seven prior bad acts were: (1-3) three robberies; (4) the 1989 shooting; (5) Petitioner's arrest for criminal possession of a weapon on December 7, 1999, (6) a conspiracy to commit a robbery, perhaps of Matheron, at the time of the December 7 arrest, and (7) the conspiracy to kill the doorman and remove evidence from the crime scene. (Rodriguez Decl., Ex. A, at 53.)

16

constitutional challenge to the admission of such evidence was unpreserved, *id.*, at 294; (2) the trial court "properly exercised its discretion in denying defendant's request to receive in evidence the videotaped statements of the two accomplice witnesses" because the witnesses admitted the prior inconsistent statements after questioning based on the transcripts, and because Petitioner's constitutional argument for admission of the videos was unpreserved, *id.*, at 294; and (3) Petitioner's conviction was not against the weight of the evidence, *id.*, at 294.  The Appellate Division also "perceive[d] no basis for reducing the sentence." *Id.*

### b.      Appeal to the Court of Appeals

Through counsel, Petitioner submitted a series of letters requesting permission to appeal to the New York Court of Appeals. (*See generally* Rodriguez Decl., Exs. E-H.)  In those letters, Petitioner's argument primarily focused on the trial court's denial of Petitioner's request to show Shannon's and Johnson's videotaped statements to the jury.[17] (*See* Rodriguez Decl., Ex. F, at 1-4 (Letter to Hon. Albert M. Rosenblatt from Saadia Aleem, Esq., dated May 3, 2006).) Petitioner also noted, though, that "this case present[ed] two other important issues of law," namely, the standard of review for determining whether a verdict is against the weight of the evidence, and the extent to which uncorroborated testimony regarding prior bad acts may be admitted under *Molineux*.[18] (*Id.*, at 5.)  After a telephone conference with the assigned judge,

---

[17] Petitioner's initial, two-page letter attached the briefs and decision from the Appellate Division and requested "the opportunity to file a supplemental letter with the judge to whom this matter is assigned, addressing in greater detail the reasons why the Court should review his case and how the issues are preserved for this Court's review." (Rodriguez Decl., Ex. E (Letter to Hon. Judith S. Kaye from Saadia Aleem, Esq., dated Apr. 6, 2006).)  That letter did not contain substantive legal argument.

[18] Similarly, in a reply letter, Petitioner again focused on the legal questions raised by the trial court's exclusion of the videos, but also briefly mentioned "the other questions presented in [Petitioner's] leave application." (Rodriguez Decl., Ex. G, at 3 (Letter to Hon. Albert M. Rosenblatt from Saadia Aleem, Esq., dated May 16, 2006).)

Petitioner's counsel submitted a supplemental letter surveying, in response to questions from the judge, the law of other jurisdictions on the video-evidence issue. (*Id.* Ex. H (Letter to Hon. Albert M. Rosenblatt from Sara Gurwitch, Esq., dated July 6, 2006).) The prosecution argued that leave to appeal should not be granted because Petitioner's claim that the videos should have been admitted as substantive evidence, and not just for impeachment, was unpreserved, and because the law in New York on the issue was "well-settled" and there was no need for intervention from the highest court. (*Id.* Ex. I, at 1-3 (Letter to Hon. Albert M. Rosenblatt from Mary C. Farrington, Esq., dated July 17, 2006).) Judge Rosenblatt granted Petitioner leave to appeal to the Court of Appeals. (*Id.*, Ex. J.)

Petitioner's opening brief to the Court of Appeals then listed only one "question presented": the question of whether Johnson's and Shannon's videotaped statements should have been admitted into evidence at trial. (Rodriguez Decl., Ex. K, at 3.)

The Court of Appeals affirmed Petitioner's conviction on May 8, 2007. *People v. Person*, 8 N.Y.3d 973 (N.Y. 2007). In addressing Petitioner's claim regarding the exclusion of the videotape evidence, the court noted Petitioner's argument that "the jury could not reliably gauge the credibility of the witnesses without viewing their demeanor and hearing their voices during the police interviews," 8 N.Y.3d at 531, but held that this argument was unpreserved because, at trial, Petitioner had only argued that the videos should be admitted to prove the content of the prior statements, and had not "explain[ed] how the videotapes would have conveyed information beyond that provided by the verbatim transcripts of the statements," *id.* at 532. Petitioner's "constitutional arguments" that the exclusion of the videos denied him the right to a fair trial and the right to confront the witnesses against him were, the Court of Appeals found, "similarly unpreserved." *Id.*

18

### 5.     Petitioner's Motion for a Writ of Error *Coram Nobis*

On January 2, 2008, Petitioner filed a *pro se* motion in the Appellate Division, seeking a writ of error *coram nobis*. (Rodriguez Decl., Ex. O.) Petitioner argued that his appellate attorney was ineffective because, on direct appeal, counsel failed to assert a number of claims of ineffective assistance of trial counsel. (*Id.*, at 1.) Specifically, Petitioner argued that appellate counsel should have raised claims that trial counsel (1) failed to raise a proper objection to the trial court's exclusion of videotape evidence showing prior inconsistent statements of witnesses; (2) failed to preserve for appellate review a *Brady* issue regarding the prosecution's purported failure to disclose cooperation agreements with witnesses; and (3) failed to object, at trial, to the prosecutor's introduction of evidence of Petitioner's uncharged crimes. (*Id.*, at 1-2.)

On April 1, 2008, the Appellate Division denied Petitioner's *coram nobis* application (Rodriguez Decl., Ex. R), and, on July 21, 2008, the New York Court of Appeals denied Petitioner's application for leave to appeal, finding that there was no question of law presented that the Court of Appeals ought to review (*id.*, Ex. T).

### 6.     The Instant Habeas Petition

Petitioner filed his habeas Petition in this Court on August 1, 2008. (*See* Petition, dated Aug. 1, 2008 ("Pet.") (Dkt. 1[19]).) Petitioner asserts three grounds for habeas relief. (*See id.*, at 5-9.) "Ground I" restates, nearly verbatim, the heading and first paragraph of "Point I" of Petitioner's brief to the Appellate Division, arguing that Petitioner's constitutional rights were

---

[19] Although the docket entry for the Petition is dated August 26, 2008, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), and this Court will therefore deem the Petition to have been filed on August 1, 2008, the date when Petitioner declares, under penalty of perjury, that he delivered the Petition to prison authorities to be mailed to the Court, *see, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

violated by admission of evidence regarding uncharged crimes. (*Compare* Pet., at 5, *with* Rodriguez Decl., Ex. A, at 50-51.)  "Ground II" restates, again nearly verbatim, the heading and first several paragraphs of "Point II" of Petitioner's initial appellate brief, arguing that exclusion of the videotapes violated Petitioner's constitutional rights to confront witnesses and present a defense. (*Compare* Pet., at 5-7, *with* Rodriguez Decl., Ex. A, at 65-67.)  "Ground III" asserts ineffective assistance of appellate counsel, based on appellate counsel's failure to raise a claim of ineffective assistance of trial counsel. (*See* Pet., at 7.)[20]

Respondent submitted a declaration and memorandum in opposition to the Petition, as well as copies of the state-court trial transcript, on January 29, 2009. (*See* Rodriguez Decl. (Dkt. 6); Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated Jan. 29, 2009 ("Resp. Opp.") (Dkt. 7); State Court Transcript (Dkt. 8, 9).)  Petitioner twice requested extensions of time to file a reply, and this Court granted both extensions. (*See* Dkts. 10, 12.)  Petitioner, however, never filed a reply.

### DISCUSSION

I.      **APPLICABLE LEGAL STANDARDS**

   A.      **Statute of Limitations**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition must be filed within one year of the latest of four dates specified by statute, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of

---

[20] At one point, Petitioner asked this Court to hold his Petition in abeyance to allow him to exhaust claims of *Brady/Giglio* violations based on "newly discovered facts contained in the plea/sentencing minutes of Oliver Johnson and Nakia Shannon." (*See* Request for Petition to be Held in Abeyance, dated Dec. 12, 2011, at ¶ 8 (Dkt. 19).)  Petitioner later withdrew that request when he "found out that such claims are not newly discovered and were already argued in state court." (Letter to Court from Paul Person, dated Apr. 30, 2012 (Dkt. 21).)

the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) (2000); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (citations omitted) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari").

### B.   Exhaustion

A federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his federal claims to the state courts, thereby affording those courts the "initial opportunity to pass upon and correct alleged violations of [the] prisoners' federal rights." *Picard*, 404 U.S. at 275 (internal quotation marks and citation omitted). There are several ways by which a petitioner can fairly present a federal claim to the state appellate court, including by citing the relevant provisions of the federal Constitution in his appellate brief. *See Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001).

Once the state courts are appraised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (internal quotation marks and citation omitted). A petitioner may be found to have satisfied this requirement where, with his letter seeking leave to appeal, he submits a copy of his brief before the lower appellate court, and the "fair import" of the total application suggests a request for review of the constitutional claims raised in that brief. *Galdamez v. Keane*, 394 F.3d 68, 74-76 (2d Cir. 2005). If leave to

21

appeal to the state's highest court is granted, however, a petitioner may still be found to have abandoned (and therefore not exhausted) claims that, while fairly raised in his initial leave application, are not then mentioned in his subsequently filed briefs. *See Leon v. Conway*, No. 09 CV 5760 (RPP), 2010 WL 3001709, at *6 (S.D.N.Y. July 30, 2010) (holding claim of prosecutorial misconduct not exhausted where, after initial letter seeking leave to appeal referenced all claims, subsequent appellate brief did not address prosecutorial misconduct claim).

## C.   <u>Standard of Review</u>

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA. *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In addition, under AEDPA, a state court's factual findings are presumed correct where not manifestly unreasonable, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).[21]  An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003).  The state court's decision, however, "must have been more than incorrect or erroneous" – rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).  In other words, the state court's ruling must have been "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

**D.    Procedural Bar**

Federal habeas review of a claim is not available where the state court's disposition of that claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The state law ground

---

[21] The Supreme Court has emphasized that "clearly established [f]ederal law" refers only to the "'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412); *see also Rodriguez v. Miller*, 537 F.3d 102, 107 (2d Cir. 2007) ("*Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard dicta for habeas purposes.").  Thus, a principle of constitutional law "grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot provide the basis for habeas relief. *Rodriguez*, 537 F.3d at 106-07 (citing *Musladin*).

may be substantive or procedural, *id.*, such as a failure to comply with a state preservation requirement.

In evaluating whether the state court has found a claim to be procedurally defaulted under state law, this Court must look to the last reasoned state-court opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). To determine whether the state-law ground on which the state court rested was "truly an independent basis for decision or merely a passing reference, . . . such reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (emphasis added) (internal quotation marks and citation omitted); *see also Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (to preclude federal review, the state court "must 'clearly and expressly state[ ] that its judgment rest[ed] on a state procedural bar'" (citation omitted)). To be deemed adequate, the state procedural rule on which the court's decision was based must be a rule that is "firmly established and regularly followed" by the state in question, *see Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (internal quotation marks and citation omitted), and must not have been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks and citation omitted).

In the event that a petitioner's federal habeas claim is procedurally barred because it was decided by the state court on an independent and adequate state-law ground, the petitioner can overcome the procedural bar by showing (1) both cause for failing to raise the claim properly in state court and prejudice resulting from the alleged constitutional error, or (2) that the failure to address the claim on habeas would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

24

"Cause" for a procedural default is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). More specifically, a petitioner can show "cause" for a procedural default when (1) "the factual or legal basis for a claim was not reasonably available," (2) "'some interference by state officials' made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994). "[P]rejudice" requires a petitioner to demonstrate that the alleged constitutional error worked to the petitioner's "*actual* and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

To establish that a "fundamental miscarriage of justice" has occurred, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier*, 477 U.S. at 496. "To be credible, [a claim of actual innocence] requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## II.   PETITIONER'S CLAIMS

The Court of Appeals affirmed Petitioner's conviction on May 8, 2007, and the time for Petitioner to apply to the Supreme Court of the United States for a writ of certiorari expired 90 days later, on August 7, 2007, at which point Petitioner's conviction became final for purposes of the AEDPA statute of limitations. *See Williams*, 237 F.3d at 150-51. The Petition was filed

25

within one year of that date, on August 1, 2007. The Petition is thus timely,[22] as Respondent concedes. (*See* Resp. Opp., at 23-24.) For the reasons discussed below, however, Petitioner cannot prevail on any of his habeas claims.

### A.   Due Process Challenge to the Trial Court's Admission of Evidence of Uncharged Crimes

Petitioner claims that he is entitled to habeas relief based on the trial court's admission of evidence of several uncharged crimes, including evidence that Petitioner had shot someone in Johnson's presence, evidence that Petitioner committed additional robberies with Johnson, and evidence that Petitioner conspired to murder the doorman at Matheron's building. (Pet., at 5.) Although it appears that Petitioner abandoned this claim in the state courts, having raised it in his letter seeking leave to appeal to the Court of Appeals, but then having failed to address it in the brief he filed in that court (*see supra* at 22 (Part I(C)); *see also Leon*, 2010 WL 3001709, at *6), Respondent does not assert such an argument. Instead, Respondent explicitly takes the position that Petitioner has exhausted this claim. (*See* Resp. Opp., at 25 (stating that this claim "was raised in federal terms to the highest state court").) Under these circumstances, the Court should find that Respondent has waived exhaustion with respect to this claim, and thus treat the claim as if it has been exhausted, for purposes of habeas review. *See Cornell v. Kirkpatrick*, 665 F.3d 369, 376 (2d Cir. 2011) (noting that, "[a]lthough AEDPA disfavors a state waiver of exhaustion"

---

[22] Indeed, the limitations period in this case would have expired even later than one year from the date when Petitioner's conviction became final, as the statute of limitations was tolled during the pendency of Petitioner's *coram nobis* proceeding. 28 U.S.C. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."); *see also Mohsin v. Ebert*, 626 F.Supp.2d 280, 294 (E.D.N.Y. 2009) (holding habeas petition was timely because limitations period was tolled when petitioner filed *coram nobis* petition).

(internal quotation marks and citation omitted), the court will treat a claim as exhausted under AEDPA where the respondent explicitly waives any exhaustion argument).  Nonetheless, Petitioner's uncharged-evidence claim is procedurally barred and, in any event, subject to dismissal for lack of merit.

1.    **The Claim Is Procedurally Barred**

In the last reasoned decision of the state courts on Petitioner's constitutional claim regarding the trial court's admission of uncharged-crimes evidence, the Appellate Division rejected this claim as "unpreserved." *Person*, 810 N.Y.S.2d at 70 ("To the extent that [Petitioner] is raising constitutional claims with respect to the court's rulings on uncharged crimes evidence . . ., those claims are unpreserved and we decline to review them in the interest of justice.").  As the Appellate Division's reliance on the state-law preservation requirement was evident from the face of the court's decision, that decision demonstrates that the court relied on an "independent" state-law ground for rejecting Petitioner's claim.  *Guity v. Ercole*, 07 Civ. 0728 (RPP), 2007 WL 3284694, at *7–8 (S.D.N.Y. Nov. 6, 2007) ("[T]he Appellate Division's decision that [a] [p]etitioner's remaining contentions were 'unpreserved' is sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue." (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989))).  Further, New York's well-established preservation rule, requiring that parties raise specific contemporaneous objections to a trial court's rulings before challenging them on appeal, *see* N.Y.C.P.L. § 470.05(2), generally affords an "adequate" basis for the Appellate Division's decision, *see generally Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999), and the trial record does not suggest that the rule was misapplied in this particular case, *see Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003).

27

For these reasons, Petitioner's due-process claim, challenging the trial court's admission of uncharged-crimes evidence, is procedurally barred from review by this Court, and may only be considered upon a showing of (1) "cause and prejudice" or (2) a "fundamental miscarriage of justice." *See Coleman v. Thompson*, 501 U.S. at 750. Petitioner, having composed his Petition mainly of excerpts from his submissions to the Appellate Division, does not address the applicable legal standards on habeas review at all, and certainly does not address what circumstances, if any, Petitioner believes allow him to overcome the procedural bar.

Even if his *pro se* papers are construed liberally, Petitioner does not present – and, indeed, from the record presented, the Court cannot discern – any "new reliable evidence" of Petitioner's "actual innocence." *See Schlup*, 513 U.S. at 324. The Court therefore cannot read Petitioner's papers to raise a claim of "fundamental miscarriage of justice" sufficient to overcome the procedural bar. *See Coleman*, 501 U.S. at 750.

Construed liberally, however, the Petition could be read to contain arguments regarding "cause and prejudice." Although Petitioner does not contend that his unpreserved constitutional claim was in any way "not reasonably available" at trial, or that he could not raise the claim due to "interference" by state officials, *see Bossett*, 41 F.3d at 829, he does state, as a predicate to his ineffective-assistance-of-appellate-counsel claim, that trial counsel was ineffective for failing to preserve the uncharged-crimes claim. (*See* Pet., at 7.[23]) Ineffective assistance of trial counsel

---

[23] Although the Petition does not specifically assert that trial counsel was ineffective for failing to preserve this claim, Petitioner did make this assertion in his *coram nobis* application (Rodriguez Decl., Ex. O, ¶ 2 (*coram nobis* petition alleging "trial counsel[']s . . . failure to . . . preserve . . . the use of uncharged crimes")), and the Petition refers to the *coram nobis* application "for further details" (Pet., at 7). The grounds raised in the *coram nobis* application are thus incorporated by reference into the Petition. *Guzman v. Rivera*, No. 06 Civ. 3681 (SCR) (LMS), 2010 WL 4242833, at *8 & n.7 (S.D.N.Y. Mar. 17, 2010) (addressing argument that was "only put forward by Petitioner by reference in his petition for a writ of habeas corpus

may constitute "cause" to overcome the procedural bar, *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488–489 (1986)), but any such claim must itself be exhausted in the state courts before it can be grounds for a finding of "cause," *id.*, at 452-54 (holding "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"). The Second Circuit has held that a petitioner's ineffective-assistance-of-trial-counsel claim, presented to the state courts only indirectly in a *coram nobis* petition claiming ineffectiveness of *appellate* counsel and summarily dismissed by the Appellate Division, is deemed to have been exhausted for habeas purposes, but also to have been dismissed by the state courts on an independent procedural ground and thus procedurally barred. *See Aparicio v. Artuz*, 269 F.3d 78, 92-93 (2d Cir. 2001).[24]  Petitioner's ineffective-assistance-of-trial-counsel claim, to the extent he even makes such a claim, is thus itself procedurally barred and cannot constitute "cause" for his failure to preserve his substantive constitutional arguments regarding the trial court's admission of evidence of uncharged crimes.[25]

---

to his state appellate court brief"); *see also* Resp. Opp., at 39 (addressing Petitioner's grounds for ineffective assistance of appellate counsel, including those grounds only raised *coram nobis* application).

[24] *See also Garcia v. Laclair*, No. 06 Civ. 10196 (SHS) (DF), 2011 WL 1097414, at *15-16, (S.D.N.Y. Jan. 3, 2011) (applying *Aparicio* to hold claim for ineffective assistance of trial counsel raised only in *coram nobis* petition was procedurally barred), *report and recommendation adopted by* 2011 WL 1046058 (Mar 22, 2011); *Davis v. Greene*, No. 04 Civ. 6132 (SAS), 2008 U.S. Dist. LEXIS 4968, at *29–31 (S.D.N.Y. Jan. 22, 2008) (holding that, under *Aparicio*, petitioner's ineffective-assistance-of-trial-counsel claim was procedurally barred because (1) that claim was only raised in a *coram nobis* motion, (2) the *coram nobis* motion was summarily denied, and (3) the state court's denial of the ineffective-assistance-of-trial-counsel claim therefore rested on an independent and adequate state law ground).

[25] The procedural default on the claim of ineffective assistance of trial counsel could itself be excused by a showing of "cause" as to why Petitioner did not raise that claim on his direct appeal. *See Edwards*, 529 U.S. at 453. Although ineffectiveness of appellate counsel in violation of the Sixth Amendment can satisfy the "cause" requirement, *see Murray*, 477 U.S. at

29

Accordingly, Petitioner cannot overcome the procedural bar to this Court's review of his constitutional claim regarding the uncharged-crimes evidence.

### 2.      The Claim Is, in Any Event, Without Merit.

Even if Petitioner could make an adequate showing of "cause and prejudice" to overcome the procedural bar, and thereby obtain this Court's *de novo* review of his constitutional due-process claim arising from the admission of uncharged-crimes evidence, this claim would, in any event, fail on the merits.

The decision to admit evidence of uncharged crimes or prior bad acts is a decision of state evidentiary law that is "generally . . . not a basis for habeas relief." *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). It is true that "[d]ue process requires the state courts in conducting criminal trials to proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice,'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1991), but the Supreme Court has explicitly declined to hold that the mere admission of evidence of uncharged crimes, even if such evidence is used to prove the defendant's propensity for engaging in criminal conduct, violates constitutional due-process guarantees. *Estelle*, 502 U.S. at 75 n.5.

"[I]t must be recognized that 'not all erroneous admissions of evidence,'" even unduly prejudicial ones, "'are errors of constitutional dimension.'" *Sierra v. Burge*, No. 06 Civ. 14432 (DC), 2007 WL 4218926, at *5 (S.D.N.Y. Nov. 30, 2007) (alteration in original) (quoting *Dunnigan*, 137 F.3d at 125). A petitioner asserting that an evidentiary ruling violated the

---

486–88, Petitioner here cannot prevail on his ineffective-assistance-of-appellate-counsel claim, for reasons discussed separately below. (*See* Discussion, *infra*, at Point II(C).) As that claim is without merit, it cannot be used as "cause" to excuse Petitioner's procedural default. *See, e.g., Garcia*, 2011 WL 1097414, at *16.

Constitution bears a "heavy burden." *Id.* (citation omitted); *see also Dunnigan*, 137 F.3d at 125 (finding no due-process violation where trial court admitted improper testimony that defendant was a convicted felon on parole and did not give any limiting instruction to jury). "The introduction of improper evidence against a defendant" violates due process only if "the evidence 'is so extremely unfair that its admission violates fundamental concepts of justice.'" *Dunnigan*, 137 F.3d at 125 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (Due process is only violated if "erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been crucial, critical, highly significant." (internal quotation marks and citation omitted)).

Even on *de novo* review, this Court could not conclude that Petitioner's case is one of the "rare" ones, in which the state court's *Molineux* ruling "resulted in the violation of a fundamental constitutional right." *Cox v. Bradt*, No. 10 Civ. 9175 (CM) (JLC), 2012 WL 2282508, at *15 (S.D.N.Y. June 15, 2012), *report and recommendation adopted by* Order, dated June 17, 2012 (Mem. Endors.).

First of all, this Court has no basis on which to find that the trial court's admission of the evidence constituted a violation of state law. Under *Molineux*, as noted above (*see* n.11, *supra*), evidence of uncharged crimes is properly admissible for a number of reasons, including, as the trial court reasonably found here (*see* Trial Tr. 4:22-25; 182:7-183:5; 896:5-14), to provide background context or complete the narrative of events, to show consciousness of guilt (relevant here with respect to Petitioner's uncharged crime of conspiring to kill the doorman), and to show

31

the relationship between actors (here, to show the relationship between Petitioner and Johnson, as well as to show that Johnson had reason to fear Petitioner).

Second, Petitioner has offered absolutely no case authority to support his argument that his trial was rendered fundamentally unfair by the trial court's *Molineaux* ruling, such that his federal due-process rights were violated.  In fact, neither Petitioner's *pro se* habeas Petition nor his prior counseled briefs and letters to the state appellate courts cite any caselaw supporting such an argument.  (*See* Pet., at 5; *see also* Rodriguez Decl., Ex. O (referencing "constitutional rights to a fair trial and due process of law" in section heading, but citing no case law setting out or applying relevant constitutional standards); *id.* Ex. F, at 5 (summarizing uncharged-crimes issue for New York Court of Appeals without reference to constitutional dimension).)

Third, a review of factually analogous cases in this circuit shows that the trial court's rulings in this case fell well within the parameters of what has been held to be constitutionally permissible.  *See, e.g.*, *Cox*, 2012 WL 2282508, at *15 (holding, in context of trial for burglary of pharmacy chain store, that due process was not violated by admission of evidence that petitioner had received seven prior trespass notices in stores of the same chain and was not permitted to enter such stores); *Tingling v. Donelli*, No. 07 Civ. 1833 (RMB) (DF), 2008 WL 4724567, at *9 (S.D.N.Y. Oct. 24, 2008) (holding evidence of "other incidents in which [alleged pimp] had taken [underage victim] to strip and work as a prostitute in the past . . . was relevant to show that . . . [petitioner] knew" that he was facilitating underage prostitution; admission of that evidence did not violate *Molineux*, and even if it did, evidence was not sufficiently prejudicial to violate Constitution).

Fourth, the trial court, in this case, gave a limiting instruction as to the specific purposes for which the jury could consider the challenged evidence.  As this Court may presume that the

jury followed the trial court's limiting instruction, *see Herring v. Meachum*, 11 F.3d 374, 378

(2d Cir. 1993) (citing *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)), the trial court's evidentiary

ruling in this case cannot fairly be seen as having had a "substantial and injurious effect or

influence" on the jury, *Dunnigan*, 137 F.3d at 130; *see also Cox*, 2012 WL 2282508, at *16

(noting that petitioner could not show prejudice because "the trial court provided the jury with a

comprehensive limiting instruction"); *Reyes v. Morrissey*, No. 07 Civ. 2539 (LAP) (DF), 2010

WL 2034531, at *13 (S.D.N.Y. Apr. 21, 2010) (collecting cases finding no constitutional

violation where trial court gave limiting instruction on use of uncharged-crimes evidence), *report*

*and recommendation adopted by* 2010 WL 2034527 (S.D.N.Y. May 19, 2010); *Brown v. Conway*,

No. 06 Civ. 2574 (KMW) (DFE), 2010 WL 1221837, at *5, 11 (S.D.N.Y. Mar. 29, 2010)

(holding that, even though evidence of separately charged murder "played an important role in the

trial," the evidence was properly admitted under *Molineux* and, in any event, its admission did not

violate due process where trial court gave proper limiting instruction).

Finally, "in light of the entire record before the jury," the testimony Petitioner challenges

was not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt

that would have existed on the record without it." *Collins v. Scully*, 755 F.2d at 19. The record

supports the conclusion that the "basis" for Petitioner's conviction was the testimony of three

separate witnesses regarding Petitioner's role in the actual crime charged, and that the exclusion

of ancillary testimony regarding his uncharged crimes would not have raised "reasonable doubt"

as to his guilt. *See id.*

For all of these reasons, Petitioner's first claim, challenging the admission of evidence of

uncharged crimes, should be dismissed.

**B.**    **Confrontation Clause and Due Process Challenges
to the Trial Court's Exclusion of Video Evidence**

Petitioner claims that his rights to confront the witnesses against him and to present a case

in his defense were denied when the trial court denied his request to play Johnson's and

Shannon's prior videotaped statements to the jury.  (Pet., at 6-7.)  Petitioner's constitutional

challenges to the exclusion of the video evidence are exhausted, as Petitioner presented these

claims, in constitutional terms, to both the Appellate Division and the Court of Appeals, on his

direct appeal.  (*See* Rodriguez Decl., Ex. A, at 65 (Petitioner's Brief to the Appellate Division);

*id.* Ex. K, at 43-44 (Petitioner's Brief to the Court of Appeals).)  As with his claim regarding

uncharged crimes, though, Petitioner's claims regarding the exclusion of video evidence are both

procedurally barred and, in any event, without merit.

**1.**    **The Claims Are Procedurally Barred.**

Petitioner's constitutional claims regarding the excluded video evidence were explicitly

rejected by the Court of Appeals as "unpreserved."  *Person*, 8 N.Y.3d at 532 ("Defendant's

constitutional claims [regarding the exclusion of video evidence] are similarly unpreserved.").

For the same reasons discussed above with respect to Petitioner's uncharged-crimes claim, this

ruling (*i.e.*, the rejection of Petitioner's claims on an independent and adequate state-law ground)

gives rise to a procedural bar to this Court's review of the claim.  (*See* Discussion *supra*, at Point

II(A)(1).)  Petitioner can overcome that bar only by showing (a) "cause" for his default and

"prejudice" resulting therefrom, or (b) that this Court's failure to review the claim would result in

a 'fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

Once again, although Petitioner does not directly address the procedural bar, the Petition

can be read liberally to contain an assertion of "cause" for trial counsel's failure to preserve

34

Petitioner's constitutional claims regarding the exclusion of video.  Specifically, in the context of Petitioner's challenge to the effectiveness of his appellate counsel, Petitioner alleges that his trial counsel was ineffective for failing to preserve the claims.  (Pet., at 7.)  In addition, the Petition arguably alleges "prejudice" by asserting that the excluded video evidence was "a crucial means of testing the credibility of the prosecution's key witnesses."  (*Id.*)  For the reasons discussed above, however, any claim that Petitioner might have had for ineffective assistance of trial counsel is itself procedurally barred.  (*See* Discussion *supra*, at Point I(A)(i).)  Thus, Petitioner cannot demonstrate cause for his default of his Confrontation Clause and due-process claims, and, as he has made no showing of actual innocence, he cannot overcome the procedural bar.

### 2.   Petitioner's Claims Are Also Meritless.

In any event, even if Petitioner could overcome the procedural bar to this Court's review of his constitutional claims regarding the exclusion of the videotape evidence, these claims would still fail on the merits.

### a.   Confrontation Clause Claim

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him."  U.S. Const. amend. VI. The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Delaware v. Van Arsdall*. 475 U.S. 673, 678 (1986) (citing *Pointer v. Texas*, 380 U.S. 400 (1965)), "means more than being allowed to confront the witness physically," *id.* (citing *Davis v. Alaska*, 415 U.S. 308, 315 (1974)); it means having the "opportunity of cross-examination," *id.* (internal quotation marks and citation omitted).  Nonetheless, some restriction on cross-examination is constitutionally permissible.  Indeed, "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on

concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'

safety, or interrogation that is repetitive or only marginally relevant.'" *Michigan v. Lucas*, 500

U.S. 145, 149 (1991) (quoting *Van Arsdall*, 475 U.S. at 679). "The 'extent' of cross-examination

'rests in the sound discretion of the trial judge,'" *Watson v. Greene*, 640 F.3d 501, 510 (2011)

(quoting *District of Columbia v. Clawans*, 300 U.S. 617, 632 (1937)), and "[a] court's decision to

restrict cross-examination will be reversed only when the court has abused its 'broad discretion,'"

*id.* (quoting *United States v. Figueroa*, 548 F.3d 222, 226 (2d Cir. 2008)).

　　"The Supreme Court has found Confrontation Clause violations when a trial court has

prohibited *all* inquiry into an issue that is important to the jury's assessment of the witness's

credibility." *Watson*, 640 F.3d at 509 (emphasis in original). Where the trial court places some

limits on cross-examination, but still allows "extensive cross-examination" sufficient to "apprise

the jury of information enabling them to make a discerning appraisal" of a witness's credibility,

the requirements of the Confrontation Clause are satisfied. *United States v. Roldan-Zapata*, 916

F.2d 795, 806 (2d Cir. 1990) (holding district court's rulings barring cross-examination of witness

regarding two documents, while "problematic," did not violate Confrontation Clause).

　　Petitioner's Confrontation Clause claim is not supported by the law. Petitioner sought to

introduce videotape evidence in support of his theory that Johnson and Shannon told the truth to

investigators when they denied Petitioner's involvement in the crime and that they only

implicated Petitioner in exchange for plea deals. This "defense theory," though, was fully

"before" the jury "so that they could make an informed judgment as to the weight" to assign to

Johnson and Shannon's testimony. *See Davis*, 415 U.S. at 317. Although the trial court did

exclude the video itself, there is no issue as to which the trial court "prohibited *all* inquiry,"

*Watson*, 640 F.3d at 509 (emphasis in original), as Petitioner was still permitted "extensive cross-

examination" of Johnson and Shannon regarding their prior inconsistent statements, including the opportunity to quote extensively from the transcripts of those statements, *see Roldan-Zapata*, 916 F.2d at 806.

In *Pryor v. Connolly*, 460 F. Supp. 2d 530 (S.D.N.Y. 2006), a case largely analogous to this one, a habeas petitioner challenged the state trial court's refusal to allow him to show a witness, during cross-examination, the written summary of a pretrial statement that the witness had given to a defense investigator, *id.* at 532, 536. This Court denied the petitioner's claim "on its merits because petitioner had sufficient opportunity to question" the witness about her statement without the document, and because "the jury learned of inconsistencies" between the witness's previous statement and her testimony at trial. *Id.*, 460 F. Supp. 2d at 536-47. The Court found that the trial court's decision to exclude the written summary was "reasonable, in light of the delay that would have been caused" by admitting the document,[26] and that the trial was "fair," even if not necessarily "perfect." *Id.* at 537. Noting that "it might have been more effective for defense counsel to use the statement," rather than to rely on oral questioning, the Court nonetheless recognized that "the Sixth Amendment confrontation right only guarantees an opportunity to cross-examine an adverse witness; it does not guarantee the defense's preferred method of questioning or a particular level of effectiveness or success." *Id.* The same logic applies here: while it might have been "more effective" for Petitioner's trial counsel to confront Johnson and Shannon with videotape instead of transcripts, the Confrontation Clause does not

---

[26] Defense counsel had declined to share the document with the prosecution until immediately before counsel attempted to use it, at which point the prosecution requested a continuance to review the document. Under those circumstances, the trial court had held that, rather than grant the continuance, it would simply bar use of the document. 460 F. Supp. 2d at 534-35.

guarantee a particular "method of questioning," as long as the defendant is given the opportunity to place before the jury the facts underlying the defense theory. *Id.*; *see also Corby v. Artus*, 699 F.3d 159, 168 (2d Cir. 2012) (holding Confrontation Clause was not violated when "the facts [a defendant] sought to elicit from [a witness] were effectively before the jury" by implication from other testimony, even though the court proscribed direct eliciting of those facts).

### b.   Fair Trial Claim

"The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001) (citations omitted). Yet, "[w]hile a defendant has the right to present a complete defense, that right is not without limits and 'may[,] in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). That right usually does not trump, for example, the generally applicable rules of evidence, and "'[e]rroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right' to present a meaningful defense." *Washington*, 255 F.3d at 56 (quoting *Agard v. Portuondo*, 117 F.3d 696, 705 (2d Cir.1997), *rev'd on other grounds*, 529 U.S. 61 (2000)); *see also Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) ("Erroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue only where petitioner can show that the error deprived [him] of a fundamentally fair trial." (citing *Chambers*, 410 U.S. 302-03)). Specifically, exclusion of particular testimony generally does not violate the right to present a meaningful defense when "the gravamen of the excluded testimony . . . was not beyond the

jurors' knowledge." *U.S. v. Romano*, 487 F. App'x 607, 610 (2d Cir. 2012) (holding that

exclusion of expert testimony on possible source of knife wound did not violate defendant's right

to present a defense, citing *Washington*); *Washington*, 255 F.3d at 60 (holding that, despite

several problems with state courts' rationale for excluding expert testimony, defendant's right to

present a case in his defense was not violated because "issues relating to the [subject of proffered

expert testimony] were presented to the jury in several different ways").

   Thus, Petitioner's claim that the exclusion of the video violated his right to present a

defense fails for reasons similar to those discussed above regarding his Confrontation Clause

claim. The "issues" to which the excluded evidence was relevant – namely, whether Johnson and

Shannon were telling the truth at trial or in their earlier statements – were "presented to the jury in

several different ways," including through cross examination and a "vigorous summation."

*Washington*, 255 F.3d at 60. While the video might "have aided the jury," "the basic idea" that

witnesses might have lied to secure favorable treatment for themselves was "not beyond the

knowledge of the jurors." *Id.* (internal quotation marks and citation omitted).

   Accordingly, Petitioner's constitutional claims challenging the exclusion of the video

evidence must be dismissed, both because they are procedurally barred and because they cannot

stand on the merits.

### C.   Alleged Ineffective Assistance of Appellate Counsel

   Petitioner claims that he received ineffective assistance of appellate counsel because his

appellate counsel failed to raise, on direct appeal, several claims of ineffective assistance of trial

counsel. (*See* Pet., at 7.) Specifically, the Petition lists four alleged failures of trial counsel that

appellate counsel should have raised: (1) a failure to object properly to the exclusion of the video

evidence; (2) a "supposed unawareness" of Johnson's and Shannon's cooperation agreements,

and a failure to assert a *Brady* violation for the non-disclosure of those agreements; (3) a "failure to alert the jury that Ligon was an informant for the ATF and received benefits in exchange for his testimony"; and (4) a failure to assert a *Brady* claim for non-disclosure regarding Ligon. (*Id.*) The Petition also incorporates by reference a claim that appellate counsel was ineffective for failing to raise a claim on appeal that trial counsel was ineffective for not preserving the uncharged-crimes claim.[27]

These claims of ineffective assistance of appellate counsel were all raised in Petitioner's *pro se* application for a state writ of *coram nobis*. (*See generally* Rodriguez Decl., Ex. O, Q.) That application, in turn, was rejected by the Appellate Division (*see* Rodriguez Decl., Ex. R), and the Court of Appeals denied leave to appeal (*see* Rodriguez Decl., Ex. T). Petitioner's claims of ineffective assistance of appellate counsel, having been raised before the Appellate Division and then presented to the highest state court, are thus fully exhausted.

The Appellate Division rejected Petitioner's *coram nobis* petition without legal analysis. (*See* Rodriguez Decl., Ex. R ("Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon, It is ordered that said application is denied.").) As nothing in the Appellate Division's decision suggests that the court relied on a state procedural-law ground, this Court must apply AEDPA's deferential standard of review to this claim. *See Washington v. Brown*, No. 09 Civ. 544 (JG), 2009 WL 1605553, at *3 (E.D.N.Y. June 8, 2009) ("If a state court's summary disposition of a petition does not expressly indicate that a claim was denied as procedurally barred, a federal court must presume that the state court denied that claim on the merits." (citing *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006))).

---

[27] *See supra*, n.23.

For AEDPA purposes, established federal law regarding a defendant's constitutional right to the effective assistance of appellate counsel is set out in *Strickland v. Washington*, 466 U.S. 668. *See Harrington v. Richter*, 131 S.Ct. 770, 788 (2011) (holding that *Strickland* constitutes clearly established law); *see also, e.g., Smith v. Robbins*, 528 U.S. 259, 285 (2000) (applying *Strickland* to claim for ineffective assistance of appellate counsel). To establish that appellate counsel was constitutionally "ineffective," Petitioner must show that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and, (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. *See, e.g., Smith*, 528 U.S. at 285; *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001).

The first prong of the *Strickland* test incorporates a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Appellate counsel does not have a duty to advance every available non-frivolous argument on appeal. *See Jones v. Barnes*, 463 U.S. 745, 754 (1983). This is because "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues." *Id.*, 463 U.S. at 751–52. A petitioner, however, may demonstrate that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

The prejudice prong of the *Strickland* analysis requires a showing that "there is a reasonable probability that, but for counsel's [deficient performance], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this regard, it is not enough that

41

counsel's deficiency "had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test." *Id.*, at 693 (citation omitted).

The Court may reject an ineffective-assistance-of-counsel claim for failure to satisfy either prong of the *Strickland* standard, without reaching the other. *Strickland*, 466 U.S. at 697 (stating that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"); *see also Morales v. United States*, No. 98–3700, 1999 WL 1015641, at *1 (2d Cir. 1999) (finding it unnecessary to address "whether appellant's trial counsel was unreasonably deficient in his performance because any deficiency in this regard did not prejudice appellant").

Further, on habeas review under AEDPA, a petitioner "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state court applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 689 (2002). Rather, the petitioner "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* In this case, Petitioner would have to show that the ineffective-assistance-of-trial-counsel claims that he asserts appellate counsel should have raised were "significant and obvious," that the claims appellate counsel *did* choose to pursue "were clearly and significantly weaker," *Mayo*, 13 F.3d at 533, and that it was "objectively unreasonable" for the Appellate Division to come to any other conclusion, *Bell*, 535 U.S. at 689. Petitioner cannot meet that heavy burden.

Petitioner's claims regarding appellate counsel's failure to raise trial counsel's alleged failures to make the jury aware of Johnson's and Shannon's cooperation agreements and Ligon's history as an informant, or to assert *Brady* violations for the prosecution's alleged non-disclosure

of the same facts, are plainly meritless. These claims were hardly "obvious" – in fact, Petitioner's allegations are contradicted by the record.

Defense counsel was not "unaware[] of Johnson's and Shannon's cooperation agreements and the promise of leniency that they received" (Pet., at 7), as the agreements were discussed on the record before trial (*see* Pretrial Tr. 45:17-47:22), and entered into evidence at trial (Trial Tr. 86:14-89:5 (Johnson testifying about terms of his agreement; agreement entered into evidence); 294:13-298:16 (Shannon testifying about terms of her agreement; agreement entered into evidence). Further, it is unclear what *Brady* violation Petitioner believes occurred. Petitioner does not claim that he was ever unaware that Johnson and Shannon had agreed to testify against him pursuant to plea agreements, and "there is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant." *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990). Although the record does indicate that the agreements themselves were disclosed belatedly (*see* Pretrial Tr. 45:17-47:22), Petitioner does not even attempt to explain how that delayed disclosure prejudiced him in any way. *See Diaz*, 922 F.2d at 1007 (affirming conviction despite defendant's claim that he only learned of alleged *Brady* material at trial, as, "even where there has been a *Brady* violation, a defendant is not entitled to reversal unless he can show that the delayed disclosure caused him prejudice"). Further, despite the delayed disclosure, the agreements were "plainly . . . available" for defense counsel's use in cross-examination and summation. *Diaz*, 922 F.2d at 1007; *see e.g.* Trial Tr. 204:3-205:14 (cross-examination of Johnson regarding agreement); 730:12-20 (defense counsel referencing plea agreement in summartion).

Petitioner's allegation of a *Brady* violation regarding Ligon fares no better. Contrary to Petitioner's contention (*see* Pet., at 7), the jury was alerted to Ligon's history as an ATF

43

informant by Ligon's own testimony (Trial Tr. 442:13-443:10), and was similarly aware of the cooperation agreement by which Ligon "received benefits in exchange for his testimony" (Pet., at 7; *see* Trial Tr. 436:24-442:12 (Ligon testifying to terms of his plea agreement). Petitioner does not explain what facts about Ligon were undisclosed,[28] or how that nondisclosure (if any) was prejudicial, given that defense counsel was able to use the agreement to call Ligon's credibility into issue at trial. (*See* Trial. Tr. 548:17-549:15; 565:12-569:5.)

In short, Petitioner has not sufficiently alleged a *Brady* violation regarding any of the cooperation agreements at all, and certainly not one so "significant and obvious," *Mayo*, 13 F.3d at 533, that trial counsel was ineffective for failing to raise it. Certainly, under the deferential AEDPA standard, this Court cannot conclude that the Appellate Division was unreasonable for rejecting, on *coram nobis*, Petitioner's claim that his appellate counsel was ineffective for failing to raise these seemingly meritless claims.

Petitioner also cannot prevail on his claim that appellate counsel should have raised, on appeal, a claim based on trial counsel's failure to preserve Petitioner's challenges to the exclusion of video evidence. Neither the performance of trial counsel, in this regard, nor that of appellate

---

[28] There is some indication from the record that Ligon's plea agreement itself was belatedly disclosed, like the agreements of Johnson and Shannon. (*See* Pretrial Tr.45:4-47:22 (defense counsel requesting disclosure of information about plea agreements of prosecution witnesses, including at least some information about Ligon; court ordering prosecution to turn over information).) Yet, such belated disclosure would not itself constitute a *Brady* violation, unless Petitioner was prejudiced, as discussed above. Further, the record is unclear as to when defense counsel obtained the agreement, as the prosecutor stated that "all of the information regarding anything to do with Karl Ligon" was in defense counsel's possession from the records of a previous, highly publicized trial in which Ligon was the star witness. (*Id.* 47:13-20.) At the very least, it appears that, whether or not defense counsel actually had the information, the information was in the public record because of the prior trial. *See Gotti v. U.S.*, 622 F. Supp. 2d 87, 96 (S.D.N.Y. 2009) ("[D]ocuments that are part of the public records are not deemed suppressed if defense counsel should know of them and fails to obtain them due to a lack of diligence in his own investigation.").

44

counsel, was patently deficient, and Petitioner cannot demonstrate the "prejudice" required by *Strickland*.

In seeking to introduce this evidence at trial, Petitioner's counsel made at least some arguments under both state and federal law. (*See generally*, Rodriguez Decl. Ex. A, at 65-75; Ex. C, at 10-15; Ex. K.) On direct appeal, Respondent contended that Petitioner's claims regarding the exclusion of the evidence (both his state and federal claims) were "largely unpreserved" (Rodriguez Decl., Ex. B, at 66-67), but, as to Petitioner's state-law arguments, the Appellate Division implicitly rejected Respondent's contention, reaching the merits of Petitioner's state-law claim and rejecting it on substantive grounds, *see* 26 A.D.3d at 294. After granting leave to appeal, the Court of Appeals ultimately found that trial counsel had indeed failed to preserve *either* Petitioner's claim that the trial court's ruling violated New York evidentiary principles *or* his claim that he was denied a federal constitutional right. 8 N.Y.3d at 531-32.

This procedural history suggests that, at least as to Petitioner's underlying state-law claim, there was no obvious failure of preservation; at a minimum, that particular claim was not so clearly unpreserved that trial counsel's failure to preserve it was an "obvious" deficiency for appellate counsel to raise, let alone a stronger claim than the merits-based claims that appellate counsel did raise, on which counsel was actually able to secure leave to appeal to the Court of Appeals. *See Mayo*, 13 F.3d at 533. Further, as discussed above, Petitioner's federal constitutional challenge to the exclusion of the videos is without merit. In this regard, as trial counsel cannot be found to have been ineffective for failing to raise a meritless claim, *see Aparicio*, 269 F.3d at 99, appellate counsel, in turn, cannot be found to have been ineffective for failing to raise a claim based on trial counsel's conduct. The fact that the underlying federal

45

claim lacks merit also means that Petitioner suffered no prejudice from appellate counsel's failure to raise it in the context of an ineffective-assistance-of-trial-counsel claim, as Petitioner cannot show that such a claim would have had any likelihood of success.  Accordingly, Petitioner can not satisfy the requirements of *Strickland* with respect to a claim that his appellate counsel was ineffective for failing to challenge the conduct of trial counsel, either with respect to trial counsel's failure to preserve a state-law claim relating to the exclusion of the video evidence, or with respect to trial counsel's failure to preserve a federal claim relating to the same evidence. Certainly, Petitioner has not shown, as required by AEDPA, that the Appellate Division was unreasonable when it concluded, on *coram nobis*, that Petitioner had not met the *Strickland* standard.

For similar reasons, Petitioner has no viable ineffective-assistance-of-appellate-counsel claim based on counsel's failure to raise, on appeal, a claim based on trial counsel's failure to preserve Petitioner's constitutional challenge to the uncharged-crimes evidence.  The Appellate Division, which, on direct appeal, issued the last reasoned determination regarding the uncharged-crimes evidence, rejected Petitioner's federal due-process claim as unpreserved, but then went on to note that "[w]ere [it] to review the[] claim[], [it] would find [it] to be without merit." 26 A.D.3d at 294.  The court thereby signaled that, even if trial counsel had preserved the claim, it would have been rejected, and thus Petitioner cannot show that lack of preservation was itself prejudicial.  In any event, as discussed above, Petitioner's constitutional challenge to the exclusion of the uncharged-crimes evidence is itself without merit.  Once again, as the claim that trial counsel allegedly failed to preserve was meritless, the failure to preserve was not prejudicial, and trial counsel was therefore not deficient under *Strickland*.  By logical extension, appellate counsel was not deficient for declining to assert this ineffective-assistance-of-trial-counsel claim

46

on appeal, and, under AEDPA, the Court cannot find that the Appellate Division's rejection of Petitioner's ineffective-assistance-of-appellate-counsel claim, on *coram nobis*, was unreasonable.

Finally, when viewed in its entirety, the record suggests that Petitioner's appellate counsel represented Petitioner vigorously and well. *See Cotto v. Lord*, No. 99 Civ. 4874 (JGK), 2001 WL 21246, at *17 (S.D.N.Y. Jan. 9, 2001) ("[v]iewing trial counsel's representation as a whole demonstrates that trial counsel provided effective representation"), *aff'd* 21 F. App'x 89 (2d Cir. 2001). Not only did Petitioner's appellate counsel present several arguments forcefully to the Appellate Division, but counsel diligently pursued, and eventually secured, review of Petitioner's case by the Court of Appeals.

For all of these reasons, Petitioner cannot show that the Appellate Division violated "clearly established federal law" when it held that Petitioner's appellate counsel had not been constitutionally ineffective, and I recommend that Petitioner's claims of ineffective assistance of appellate counsel be dismissed.

## CONCLUSION

For the reasons stated above, I respectfully recommend that the Petition be dismissed in its entirety. I further recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (providing for three additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Loretta A. Preska, Chief Judge, United States

Courthouse, 500 Pearl Street, Room 2220, New York, New York 10007, and to the chambers of

the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York

10007. Any requests for an extension of time for filing objections must be directed to Judge

Preska. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT

IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See*

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d

Cir. 1983).

 If Petitioner does not have access to cases cited herein that are reported only on Westlaw

or LEXIS, he may request copies from Respondents' counsel. *See* Local Civ. R. 7.2 ("Upon

request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities cited

therein that are unpublished or reported exclusively on computerized databases] as are cited in a

decision of the Court and were not previously cited by any party.").

Dated:  New York, New York
         May 23, 2013

                                             SO ORDERED

                                             _____
                                             DEBRA FREEMAN
                                             United States Magistrate Judge

Copies to:

Hon. Loretta A. Preska, U.S.D.J.

Mr. Paul Person
DIN# 04-A-2244
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY, 10562

Respondent's counsel (via ECF)